## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JOHN C. BRAMBL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **Case No. 10-CV-474-TCK-PJC** |
| | ) |
| GEICO GENERAL INSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Before the Court is Defendant's Motion to Dismiss (Doc. 34).

### I.      Factual Background

In his Second Amended Complaint, Plaintiff alleges that, on or around December 21, 2007, he was injured in a motor vehicle accident due to the negligence of a third party. Plaintiff has a policy of uninsured/underinsured motorist ("UM") coverage with Defendant GEICO General Insurance Company. Plaintiff requested benefits under the policy, "as the value of Plaintiff's claim clearly exceeded the tort-feasor's liability policy limits." (Second Am. Compl. ¶ 10.) In response, Defendant tendered the limits of Plaintiff's UM policy. However, "unbeknownst to Plaintiff, [Defendant] recovered the whole amount tendered to Plaintiff from the tortfeasor's liability insurer, reducing the amount of insurance available to Plaintiff to compensate for his injuries." (*Id.* ¶ 11.) Plaintiff alleges that Defendant (1) "breached its contract of insurance and has wholly refused or neglected to pay Plaintiff the value of his damages," (*id.* ¶ 16); and (2) "[i]n its handling of Plaintiff's claim . . ., including but not limited to the acts and manner in which Defendant evaluated Plaintiff's claim, and as a matter of routine practice in handling similar claims, Defendant breached

its duty to deal fairly and in good faith," (*id.* ¶ 19).  Defendant moved to dismiss, arguing that its

alleged conduct does not state a plausible claim for breach of contract or bad faith.[1]

## II.    Rule 12(b)(6) Standard

In considering a motion to dismiss under Rule 12(b)(6), a court must determine whether the

plaintiff has stated a claim upon which relief may be granted.  The inquiry is "whether the complaint

contains 'enough facts to state a claim to relief that is plausible on its face.'" *Ridge at Red Hawk,*

*LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*,

550 U.S. 544)).  In order to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must "'nudge [ ]

[his] claims across the line from conceivable to plausible.'" *Schneider*, 493 F.3d at 1177 (quoting

*Twombly*, 127 S. Ct. at 1974).  Thus, "the mere metaphysical possibility that some plaintiff could

prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the

court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for

these claims." *Schneider*, 493 F.3d at 1177.

The Tenth Circuit has interpreted "plausibility," the term used by the Supreme Court in

*Twombly*, to "refer to the scope of the allegations in a complaint" rather than to mean "likely to be

true." *Robbins v. Okla. ex rel. Okla. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008).

Thus, "if [allegations] are so general that they encompass a wide swath of conduct, much of it

innocent, then the plaintiffs have not nudged their claims across the line from conceivable to

plausible." *Id.* (internal quotations omitted).  "The allegations must be enough that, if assumed to

---

[1]  The phrase "bad faith" is a "shorthand reference to a breach of the duty of good faith and fair dealing implied in Oklahoma insurance contracts." *Brown v. Patel*, 157 P.3d 117, 121 n.4 (Okla. 2007).  "Under Oklahoma law, a tort claim for bad faith and a claim for breach of contract are separate and independent bases for recovery." *Ball v. Wilshire Ins. Co.*, 221 P.3d 717, 724 (Okla. 2009).

be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Id.* "This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them." *Id.* at 1248. In addition, the Tenth Circuit has stated that "the degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context" and that whether a defendant receives fair notice "depends on the type of case." *Id.*

## III.   Oklahoma Uninsured Motorist Law

The Court's rulings are informed by the following general principles of Oklahoma UM law.

### A.   Mandatory Offer of UM Coverage

By Oklahoma statute, any insurance company entering into a contract with an insured to provide motor vehicle liability coverage must also offer UM coverage. *See* Okla. Stat. tit. 36, § 3636(A) (stating that "[n]o policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be issued . . . *unless* the policy includes the coverage described in subsection B . . .) (emphasis added); *id.* § 3636(B) (stating that policies referred to in subsection A "shall provide coverage therein . . . for the protection of persons who are legally entitled to recover damages from owners or operators of uninsured motor vehicles and hit-and-run motor vehicles because of bodily injury, sickness or death, including death resulting therefrom"). The offer of UM coverage required by § 3636(B) must be presented to the insured in a particular form ("Form"), which gives the insured options of (1) carrying UM coverage in the amount of his bodily injury liability coverage; (2) carrying UM coverage in the minimum amounts of $25,000.00 per person/$50,000.00 per occurrence; (3) designating a specific amount; or (4) rejecting UM coverage.

3

*Id.* §3636(H).   The Form encourages the insured to accept UM coverage, stating that "YOU SHOULD SERIOUSLY CONSIDER BUYING THIS COVERAGE IN THE SAME AMOUNT AS YOUR LIABILITY INSURANCE COVERAGE LIMIT" and "THE COST OF THIS COVERAGE IS SMALL COMPARED WITH THE BENEFITS!" *Id.*

UM coverage "does not insure uninsured motorists, (third parties); nor does it insure vehicles; rather, uninsured motorist coverage affords first-party coverage to person(s) for whom the insurance contract is being written." *Silver v. Slusher*, 770 P.2d 878, 885 (Okla. 1988) (Silver, J., dissenting).  UM coverage is "personal and portable," meaning it provides protection to the insured under all circumstances, regardless of whether the insured is in a vehicle covered by the policy, so long his injuries are caused by an uninsured motorist. *See* Johnny Parker, *Uninsured Motorist Law in Oklahoma*, 34 Okla. City U. L. Rev. 364, 368 (2009) [hereinafter *Uninsured Motorist Law in Oklahoma*].  The overarching purpose of Oklahoma's UM statutory scheme "is to assure insurance coverage for the protection of the insured from the effects of personal injury caused by a motorist who either carries no insurance or has inadequate coverage." *Gates v. Eller*, 22 P.3d 1215, 1218 (Okla. 2001) (footnote omitted); *see also Uninsured Motorist Law in Oklahoma*, 34 Okla. City U. L. Rev. at 409 (explaining that UM coverage is "rooted in the paradigm of public policy" and is "purely a creature of statute").

### B.     Underinsured Motor Vehicle

The statutory definition of "uninsured motor vehicle," as used in § 3636(B), extends to "an insured motor vehicle, the liability limits of which are less than the amount of the claim of the person or persons making such claim, regardless of the amount of coverage of either of the parties in relation to each other."   Okla. Stat. tit. 36, § 3636(C).   Thus, an insured motor vehicle may nonetheless qualify as an "uninsured motor vehicle," depending on the vehicle's liability coverage

4

policy limits and the extent of the injured party's damages.  This type of "uninsured motor vehicle" is often referred to as "underinsured motor vehicle," and such coverage is often referred to as UIM coverage.  Consistent with the statute, the Court uses the term UM coverage as an inclusive term encompassing UIM coverage.

When the UM carrier's insured sustains injury by a negligently operated *under*insured motor vehicle, there are necessarily two insurance policies in play (injured party's UM coverage and tortfeasor's liability coverage).  This led to litigation regarding the nature and extent of the UM carrier's obligations in relation to the tortfeasor's insurer's obligations.  In *Burch v. Allstate Insurance Company*, 977 P.2d 1057, 1058 (Okla. 1999), the Oklahoma Supreme Court held that UM coverage is "primary insurance."  Primary insurance is defined as "that which pays a policyholder's first-dollar damages and is the first policy line to pay such damages."  *Id.* at 1058 n.4.  Primary insurance must be paid without regard to any other insurance available.  *Id.*  Thus, a UM carrier may not withhold payment of UM benefits, waiting until the tortfeasor's liability limits are exhausted. *Id.* at 1063.  Instead, § 3636 "mandates that when the preconditions for the loss under uninsured motorist coverage exist, an uninsured motorist carrier is obligated to pay the entire loss of its injured from the first dollar up to the policy limits."  *Id.* at 1064.  The "'first-dollar damages' construction of § 3636" is intended to "facilitat[e] prompt payment to the insured."  *Id.* at 1065.[2]

With respect to timing of payments under each policy, an insured may seek its UM coverage without first seeking recovery against the tortfeasor.  *See id.* at 1064 (approving reasoning in *Roberts*

---

[2]  In some states, known as "gap" coverage states, "an insured is allowed to recover under his UM coverage only if the tortfeasor's policy limit is less than the injured insured's." *GEICO Gen. Ins. Co. v. NW. Pacific Indem. Co.*, 115 P.3d 856, 859 (Okla. 2005).  The Oklahoma Supreme Court does not require any "gap" in coverage in order for UM obligations to arise and has renounced the gap theory.  *See id.*

*v. Mid-Continent Cas. Co.*, 790 P.2d 1121 (Okla. Ct. App. 1989)).  Where UM coverage is sought

first, the "insurer must go about the business of investigating and evaluating the claim," rather than

wait for the insured to exhaust the tortfeasor's liability limits.  *Buzzard v. Farmers Ins. Co., Inc.*, 824

P.2d 1105, 1112 (Okla. 1991).  "Once this is accomplished, if the insurer determines that the claim

does not exceed [the tortfeasor's] liability limits, and such valuation is supported by reasonable

evidence, the underinsurer may delay payment."  *Id.*  "[I]f the underinsurer does not conduct an

investigation, or after investigation, determines that the likely worth of the claim exceeds the

liability limits, prompt payment must be offered."  *Id.*; *see also Barnes v. Okla. Farm Mut. Bureau*

*Ins. Co.*, 869 P.2d 852, 855 (Okla. Civ. App. 1994) (explaining that UM coverage "is available to

a claimant whenever the insured's claim for damages exceeds the liability insurance limits of the

tortfeasor").  In determining what amount a UM carrier must pay, "there can be no credit given to

a UM carrier for the amount of liability coverage held by a tortfeasor."  *Burch*, 977 P.2d at 1064

(approving reasoning in *Roberts*).  This is because "the intent of the legislature was to prohibit

diminution of an injured party's recovery based upon payments made by a tortfeasor."  *Burch*, 977

P.2d at 1064 (approving reasoning in *Roberts*).

### C.      UM Carrier's Subrogation Rights

Following is the subrogation provision of the UM statute:

F. *In the event of payment* [by UM carrier] to any person under the coverage required
by this section [insured] and subject to the terms and conditions of such coverage,
*the insurer making such payment shall, to the extent thereof, be entitled to the*
*proceeds of any settlement or judgment resulting from the exercise of any rights of*
*recovery of such person [insured] against any person or organization legally*
*responsible for the bodily injury [tortfeasor]* for which such payment is made,
including the proceeds recoverable from the assets of the insolvent insurer. . . .
Provided further, that any payment made by the insured tort-feasor shall not reduce
or be a credit against the total liability limits as provided in the insured's own
uninsured motorist coverage.
. . .

6

Okla. Stat. tit. 36, § 3636(F) ("§3636(F)") (emphasis added).  The UM carrier's statutory "right to be subrogated is derived from, and limited to, the tort claim of the insured." *Frey v. Independence Fire and Cas. Co.*, 698 P.2d 17, 21 (Okla. 1985); *Hartford Ins. Co. of Midwest v. Dyer*, 61 P.3d 912, 915 (Okla. Civ. App. 2002) ("[UM carrier] – as the subrogated UM insurer – could only assert whatever rights [its inured] had against the tortfeasor . . ."); *Uninsured Motorist Law in Oklahoma*, 34 Okla. City U. L. Rev. at 408 ("[T]he insurance company's right to subrogation is of the same nature as the insured's claim against the uninsured motorist.").

Therefore, "[i]f the insured releases the wrongdoer from liability, the insurer's subrogation rights may be viewed . . . as having been destroyed  . . . . because the insured no longer has a tort claim against the wrongdoer to which subrogation may be effected." *Uninsured Motorist Law in Oklahoma*, 34 Okla. City U. L. Rev. at 408; *see Porter v. MFA Mut. Ins. Co.*, 643 P.2d 302, 305 (Okla. 1982) ("[I]f an insured settles with and releases a wrongdoer from liability for a loss before payment of the loss has been made by the insurer, the insurer's right of subrogation against the wrongdoer is thereby destroyed.").  Although such a release extinguishes the UM carrier's subrogation rights, such a release also provides the UM carrier with a defense to an action to recover UM proceeds.  *See Porter*, 643 P.2d at 305 (known in Oklahoma as a *Porter* defense).[3]

---

[3] In order for the defense to apply, the insured must, at the time of executing the release of the tortfeasor, be voluntarily and knowingly interfering with its UM carrier's subrogation rights. *See Phillips v. N.H. Ins. Co.*, 263 F.3d 1215, 1222 (10th Cir. 2001) (applying Oklahoma law) (holding that *Porter* defense did not apply where insured executed release of tortfeasor prior to knowing identity of her employer's UM carrier or obtaining a copy of such policy). The *Porter* defense is also subject to several exceptions, including where the insurer's surrounding conduct gives rise to breach of contract, waiver, or estoppel.  *See generally Uninsured Motorist Law in Oklahoma*, 34 Okla. City U. L. Rev. at 404-05 (explaining exceptions and citing relevant Oklahoma cases).

Because the insured's voluntary settlement with the tortfeasor destroys the UM carrier's subrogation rights and operates as a forfeiture of any UM coverage, the Oklahoma Legislature "created a mechanism by which an insured could receive the equivalent of a settlement offer from the tortfeasor, while at the same time protecting the [UM] carrier's subrogation rights against the wrongdoer." *Uninsured Motorist Law in Oklahoma*, 34 Okla. City U. L. Rev. at 406.  Specifically, the UM subrogation statute requires that an insured: (1) notify her UM carrier of any "tentative agreement to settle for liability limits with an insured tortfeasor," and (2) submit written documentation to her UM carrier of any pecuniary losses incurred, including copies of all medical bills.  *See* Okla. Stat. tit. 36, § 3636(F)(1), (2).  Once notified, a UM carrier may, at its election, "substitute its payment to the insured for the tentative settlement amount." *Id.* § 3636(F)(2).  If the UM carrier substitutes its own payment for the liability insurer's settlement offer, the UM carrier is "entitled to the insured's right of recovery to the extent of such [liability settlement] payment and any settlement under the [UM] coverage." *Id.*  If it does not elect to substitute, the UM carrier "has no right to the proceeds of any settlement or judgment . . . for any amount paid under the uninsured motorist coverage." *Id.*

## IV.    Bad Faith Claim

The essential elements of Plaintiff's bad faith claim are: (1) Plaintiff was covered under the Defendant's UM policy and Defendant was required to take reasonable actions in handling Plaintiff's claim; (2) the actions of Defendant were unreasonable under the circumstances; (3) Defendant failed to deal fairly and act in good faith toward Plaintiff in the handling of Plaintiff's claim; and (4) the breach or violation of the duty of good faith and fair dealing was the direct or proximate cause of any damages sustained by Plaintiff.  *Badillo v. Mid Century, Ins. Co.*, 121 P.3d

1080, 1093 (Okla. 2005);  *Walker v. Progressive Direct Ins. Co.*, 720 F. Supp. 2d 1269, 1273 (N.D. Okla. 2010).

Defendant argues that its conduct, which it describes as the mere exercise of its statutory right to subrogation conferred by § 3636(F), cannot be viewed as unreasonable under the circumstances or as a failure to act in good faith.  In arguing that it had a vested and perfected subrogation right immediately upon payment to Plaintiff, Defendant urges the Court to construe the phrase "in the event of payment" in § 3636(F) to mean that subrogation rights arise immediately upon payment to the insured, without regard to the circumstances presented.  Plaintiff contends, in contrast, that the right of subrogation does not automatically arise upon payment to the insured in all circumstances.  Plaintiff argues that, in this case, Defendant engaged in unreasonable and bad faith conduct by evaluating his claim in a manner that led Defendant to wrongfully pursue subrogation from the tortfeasor's insurer and then retain the subrogated funds.  For reasons explained below, the Court finds that Plaintiff has stated a plausible bad faith claim.

"Generally, an implied duty of an insurer to act in good faith and deal fairly with its insured is imposed by law upon the insurer-insured relationship, and a breach of that duty arises from a breach of the insurance contract where the breach occurs in a manner constituting a lack of good faith; *i.e.*, constituting bad faith."  *Brown v. Patel*, 157 P.3d 117, 121 (Okla. 2007).  However, because "a part of every contract in this state is the law applicable to that contract . . .[,] provisions of an insurance contract may arise from statute as opposed to the express writing contained in the document agreed to by the parties."  *Id.*  Thus, "a bad-faith action could be based upon an insurer's refusal to satisfy statutory obligations imposed upon or resulting from the insurance contract."  *Id.* at 122.  "The bad-faith action may also be based upon an insurer's failure to perform an act that is derivative or secondary in nature; that is, an insurer's duty that owes its existence to a preexisting

9

implied contractual, or statutory, or status-based duty arising from the insurer-insured relationship." *Id.* In addition, bad faith actions may also be based upon "an insurer's failure to follow judicial construction of insurance contracts or other applicable law." *Id.* (citing *Barnes v. Okla. Farm Bureau Mut. Ins.*, 11 P.3d 162, 171 (Okla. 2000), which is explained in detail below, as an example of this type of bad faith action). Thus, the Oklahoma Supreme Court has held that bad faith claims may be based upon: (1) failure to perform express contractual duties, (2) failure to perform statutory duties imposed upon the contract, (3) failure to perform certain acts that are "derivative" or "secondary" and that arise from the insurer-insured relationship, or (4) failure to follow Oklahoma case law interpreting insurance contracts or Oklahoma insurance statutes.

In this case, Plaintiff alleges that Defendant breached the contract and committed bad faith by unreasonably investigating and evaluating Plaintiff's claim, leading Defendant to wrongfully seek and retain subrogation from the tortfeasor's insured. In *Barnes v. Oklahoma Farm Bureau Mutual Insurance Company*, 11 P.3d 162, 169 (Okla. 2001) ("*Barnes II* "), the Oklahoma Supreme Court affirmed a bad faith and punitive damages award against a UM carrier, Oklahoma Farm Bureau Mutual Insurance Company ("OFB"), in a case involving an insurer's unreasonable assertion and interpretation of its subrogation rights under § 3636(F). The following facts were proven at trial: (1) the injured insured had $15,000 of UM coverage with OFB; (2) the injured insured had $25,000 of UM coverage with State Farm Mutual Automobile Insurance Company ("State Farm"); (3) the tortfeasor had $10,000 of liability coverage; (4) there was no substantial question, during the time period OFB was accused of committing bad faith, that the injured insured's damages exceeded $50,000, the amount of all combined coverage; (5) OFB failed to evaluate or put a reasonable value on the injured insured's claim; (6) tortfeasor's insurer offered the insured its $10,000 liability policy limit; (7) OFB offered the insured its $15,000 UM policy limit, but conditioned on OFB's

10

entitlement to the $10,000 liability proceeds as subrogation; and (8) OFB offered to "substitute" its own payment for the settlement offer and tender $10,000 to the insured, but conditioned on the insured releasing OFB from $10,000 of its $15,000 UM obligation.  As stated by the court, "[t]he 'dispute' arose over insurer's contention, based on its counsel's advice, that once it paid $15,000 to [insured], it, rather than her would be entitled to [the tortfeasor's] $10,000 in liability coverage via a right of subrogation."  *Id.* at 168.  As further explained:

> [I]nsurer clung to the position that once it paid [insurer] either $15,000 or $10,000, it, rather than her, would reap the benefit of or have a rightful claim of entitlement to the $10,000 liability coverage and, in effect, its ultimate or actual UIM responsibility to her was only $5,000.

*Id.* at 168.[4]

Like Defendant in this case, OFB argued that the "in the event of payment" language in § 3636(F) meant that, once OFB paid its insured, it would immediately be entitled to subrogation from the tortfeasor in the amount of UM policy limits.  OFB further argued that it could therefore condition its own UM payment upon receiving proceeds from the liability policy in the amount of its offered payment.  The Oklahoma Supreme Court held that such an interpretation of the first sentence of § 3636(F) was "out of context" and ignored the remaining statutory framework, all of which clearly prohibited OFB from recouping any amounts from the tortfeasor that were needed to cover the insured's total damages.  *Id.* at 173 ("To understand § 3636(E)[5] one cannot merely take out of context one sentence or part of a sentence, but the provision must be read in its entirety,

---

[4]  In contrast to OFB, State Farm evaluated the insured's claim, found it to be in excess of all combined coverage, paid its UM limit, and did not claim any entitlement to the $10,000 liability coverage.  *Id.* at 169.  Further, concluding the tortfeasor had no assets other than the liability policy, State Farm decided not to substitute its own $10,000 payment for the tentative settlement, thereby waiving any subrogation rights.  *Id.*

[5]  Section 3636(E) has now been recodified at § 3636(F) without changes.

including the other portions of § 3636(E) we have highlighted. When one does this it is unmistakable the highlighted portion of the first sentence of § 3636(E) cannot provide a basis, in this case, for [OFB's] claim to [the tortfeasor's] liability coverage.") (footnote added).

OFB also argued that, even if it ultimately violated § 3636(F) by its proposed conditions on its UM payment, it relied on the advice of counsel and had a "legitimate dispute" with its insured as to whether it would ultimately be entitled to the $10,000 tortfeasor liability coverage, such that its actions could not support a bad faith verdict. The Oklahoma Supreme Court disagreed and held that OFB's counsel's advice was unreasonable and unfounded:

> The evidence warranted findings counsel's advice was wholly unfounded; it was contrary to the unmistakable meaning of the relevant provision(s) of § 3636; it was at odds with existing case law recognizing the legislative intent behind underinsurance coverage; it was inconsistent with a provision of the insurance policy . . .; and was nothing other than verbal slight of hand. Sufficient evidence was presented to show insurer could not have had a good faith/reasonable belief that its counsel's advice was reasonable or provided a legitimate basis for its treatment of Barnes' UIM claim. Instead, the jury was entitled to conclude insurer was unreasonably attempting to reduce or take a credit against its own UIM responsibility for the amount [tortfeasor] was offering to pay to [insured], while at the same time arguing it could protect its subrogation rights against him without compliance with the unambiguous relevant terms of § 3636(E). In effect, insurer never really offered to pay Barnes any more than $5,000 in UIM coverage.
> . . .

*Id.* at 174-75.

The Court concludes that Plaintiff's Second Amended Complaint sufficiently encompasses conduct that, if proven, may support a bad faith claim. The Court so concludes for two reasons. First, the Court rejects Defendant's principal argument that the phrase "in the event of payment" in § 3636(F) means that the subrogation right arises immediately upon payment to the insured, without regard to the factual circumstances presented. As explained above, such argument was not only rejected in *Barnes II* but was found to be an unreasonable construction of the statute, *see id.* at 173,

and the Court finds no reason to expand upon the reasoning set forth in *Barnes II*.  Defendant's cited cases from other jurisdictions are unpersuasive.

Second, Defendant is accused of doing what *Barnes II* prohibits – namely, reducing the total amount of insurance available to the insured where a reasonable evaluation of Plaintiff's claim would have revealed it to be in excess of both combined policies.[6]  In this case, Defendant allegedly accomplished the result of recovering some of the tortfeasor's liability proceeds *after* making its UM payment, rather than *conditioning* its UM payment on entitlement thereto.  However, this difference in timing does not convince the Court that Defendant's alleged conduct falls outside the scope of *Barnes II*.  *Barnes II* appears to reject a construction of Oklahoma's UM subrogation scheme that would allow a UM carrier to reduce an insured's total amount of proceeds from both policies, where the insured's damages are equal to or greater than the combined value of the policies.  Depending on the factual circumstances, most of which are unknown at this stage of litigation, it may be deemed equally as egregious to condition a UM payment on a non-existent subrogation right than to pay UM limits and then pursue a non-existent subrogation right.  Therefore, Plaintiff's allegations are sufficient to survive a motion to dismiss.

## V.      Breach of Contract Claim

The elements of breach of contract are: 1) the formation of a contract; 2) a breach thereof; and 3) actual damages suffered from that breach.  *Digital Design Grp., Inc. v. Info. Builders, Inc.*,

---

[6] The Second Amended Complaint is silent regarding the UM policy limit, the tortfeasor's policy limit, or the precise sequence of events leading to Defendant's recovery from the tortfeasor's insured.  Defendant argues, therefore, that Plaintiff has not pled enough facts to state a plausible claim.  However, by alleging that Defendant reduced the amount of insurance available to Plaintiff to compensate for his injuries, Plaintiff sufficiently alleges that his damages exceeded the combined value of both policies.  At a minimum, Plaintiff has given the Court reason to believe that he "has a reasonable likelihood of mustering factual support for these claims."  *Schneider*, 493 F.3d at 1177.

24 P.3d 834, 843 (Okla. 2001).  Defendant argues that, because the Second Amended Complaint alleges that Defendant promptly paid UM policy limits and Plaintiff accepted and retained such payment, Plaintiff has failed to state a claim for breach of contract.  Plaintiff has not pointed the Court to any specific contractual provision that was breached.[7]  However, Plaintiff's breach of contract claim appears to be based on Defendant's retention of subrogated funds from the tortfeasor's insured, where a reasonable investigation of Plaintiff's claim would have revealed that Plaintiff had not received the full value of his damages.  (*See* Second Am. Compl. ¶ 16 (alleging that Defendant "has breached its contract of insurance and has wholly refused or neglected to pay Plaintiff the value of his damages").)[8]

As explained above, "a part of every contract in this state is the law applicable to that contract."  *Brown*, 157 P.3d at 121.  "Contracts of insurance are no exception to this rule, and [the Oklahoma Supreme Court] has recognized the well-known principle that provisions of an insurance contract may arise from statute as opposed to the express writing contained in the document agreed to by the parties."  *Id.*  Plaintiff's allegations are sufficient to state a plausible claim for breach of contract based on, at a minimum, Defendant's alleged failure to comply with certain duties incorporated into the insurance contract.  There is no dispute that Defendant paid Plaintiff the bargained-for amount of UM coverage and did so promptly.  However, the alleged facts could support a finding that Defendant's "payment" to its insured, which resulted in a net loss of zero to Defendant following its retention of subrogation, did not comply with certain subrogation duties

---

[7]  The insurance contract is not part of the Rule 12(b)(6) record.

[8]  In his response brief, Plaintiff reiterated that Defendant "wrongfully reduced the amount of insurance available to compensate Plaintiff for his injuries and kept the wrongfully obtained funds, thereby wholly refusing or neglecting to pay Plaintiff the value of his damages."  (Pl.'s Resp. to Def.'s Mot. to Dismiss 4.)

14

owed to an insured whose damages exceed the combined amount of both policies.  *See supra* Part

IV.  This case is at the Rule 12(b)(6) stage, and Plaintiff's allegations are sufficient to survive a

motion to dismiss.

## VI.     Conclusion

Defendant's Motion to Dismiss (Doc. 34) is DENIED.[9]

SO ORDERED this 4th day of November, 2011.


TERENCE C. KERN
United States District Judge

---

[9] Also before the Court is Defendant's Motion to Strike Plaintiff's Expert Report (Doc. 61). Although styled as a "motion to strike," the motion is based upon the report's lack of relevance rather than its untimeliness or some other procedural defect that commonly forms the basis of a "motion to strike."  Therefore, the Court construes the "motion to strike" as a *Daubert* motion attacking the relevance of the report.  *See Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 883-84 (10th Cir. 2005) (explaining that Federal Rule of Evidence 702 and *Daubert* requires inquiry into both reliability and relevance).  The Court does not intend to rule on such motion in advance of any other *Daubert* motions, as apparently anticipated by the parties.  (*See* Joint Mot. to Extend Deadline for Filing Dispositive Motions and Daubert Motions ("A ruling on the Motion to Strike will determine whether a *Daubert* motion is necessary.").)  Instead, the Court will issue one order addressing all potential grounds for excluding Plaintiff's expert report, including any attacks on qualifications, reliability, and/or relevance.