# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JOHN C. BRAMBL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 10-CV-474-TCK-PJC |
| | ) |
| GEICO GENERAL INSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Before the Court is Defendant's Motion for Summary Judgment (Doc. 83).

**I.  Factual Background**

On December 21, 2007, Plaintiff and Christopher Ross ("Ross") had an automobile accident. Plaintiff had a policy of uninsured/underinsured motorist ("UM") coverage with Defendant GEICO General Insurance Company ("Geico"), with a policy limit of $25,000. Ross had liability coverage with Liberty Mutual Insurance Company ("Liberty"), with a policy limit of $100,000. On December 22, 2007, Plaintiff reported the accident to Geico. On January 7, 2008, Plaintiff sought medical treatment related to the accident and received chiropractic care and physical therapy. On March 4, 2008, Dr. Gregory L. Wilson examined Plaintiff, reviewed Plaintiff's MRI, diagnosed Plaintiff with a disc protrusion, and recommended Plaintiff undergo physical therapy and steroid injections.[1] On April 30, 2008, Plaintiff was discharged from physical therapy. Six months later, on November 18, 2008, Plaintiff returned to Dr. Wilson for re-evaluation. Dr. Wilson reported:

> He completed the physical therapy and states that he improved. His symptoms did not completely resolve; however, he was able to go ahead and work and resume

---

[1] Plaintiff's attorney Mr. Dan Smolen ("Smolen") was cc'd on Dr. Wilson's March 4, 2008 report. Thus, Plaintiff was represented by counsel at least by March 4, 2008. Plaintiff is represented in this litigation by Smolen's law partner, Mr. Don Smolen.

> normal activity. Unfortunately, with continued work and activity his symptoms have exacerbated again and simply are not going away. He complains of continued pain in the low back, left hip and leg in a radicular fashion. He states that the pain had become intense enough at work that he ended up having to resign from work. He is now wanting to look into repairing this so that he can return to work.

(Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. 8.) On December 9, 2008, after ordering and reviewing a second MRI, Dr. Wilson recommended that Plaintiff "undergo a left L4-5 and L5-S1 minimally invasive decompression, posterior lumbar interbody fusion and facet arthrodesis." (Def.'s Mot for Summ. J, Ex. 9.) Dr. Wilson stated that Plaintiff was going to research the recommended surgery and contact Dr. Wilson with his decision. Plaintiff has no additional medical records and incurred no further medical expenses following this December 9, 2008 visit to Dr. Wilson.

On March 10, 2009, Smolen sent a letter to Geico making an "uninsured policy demand," including all relevant medical records and billing. The letter stated: "We have currently been dealing with the 3rd party insurance, Liberty Mutual, but not yet been able to reach a settlement. We believe Chris Ross to be underinsured for the type of injury sustained by Mr. Brambl." (*Id.*, Ex. 10.) Notes in Geico's claim file indicate that Kelly Wallace ("Wallace"), Geico claims examiner, spoke with "Jenny At Lib Mutual" and that Wallace was aware that Liberty had not settled with Plaintiff. (Pl.'s Resp. to Def.'s Mot. for Summ. J, Ex. 2 at 7.) Supervisor notes in Geico's claim file state: "Reviewed File with Examiner - Agree We Will Substitute Our 25k And Retain Rights to Subro - Adverse Has 100/300 And Have Agreed They Will Reimburse Us." (*Id.*) Immediately thereafter, Wallace conducted what is labeled in the notes as a "Burch Evaluation"[2] as follows:

---

[2] A "*Burch*" evaluation refers to the Oklahoma Supreme Court case of *Burch v. Allstate Insurance Company*, 977 P.2d 1057, 1064 (Okla. 1998), wherein the Oklahoma Supreme Court held that "when the preconditions for the loss under uninsured motorist coverage exist, an uninsured motorist coverage carrier is obligated to pay the entire loss of its injured insured from the first dollar up to the policy limits." Thus, a *Burch* evaluation seeks to determine whether the tortfeasor is actually underinsured, *i.e.*, whether Plaintiff's claim is greater than the tortfeasor's liability limits.

|                                                     | Low          | High         |
|-----------------------------------------------------|--------------|--------------|
| Medical Expenses                                    | $ 8,921.05   | $ 8,921.05   |
| Future Medical Expenses                             | $ 15,000.00  | $ 25,000.00  |
| Physical Pain and Suffering Past                    | $ 2000.00    | $ 8,000.00   |
| Physical Pain and Suffering Future (contingent on surgery) | 0.00  | $ 10,000.00  |
| Permancy                                            | 0.00         | $ 5,000.00   |
| Physical Impairment                                 | 0.00         | $ 5,000.00   |
| Disfigurement                                       | N/A          | N/A          |
| Loss of Earnings                                    | None         | None         |
| Impairment of Earning Capacity                      | None         | None         |
| Total                                               | $ 25,923.05  | $ 62,921.05  |

(*Id.* at 6-7.)

On March 25, 2009, Wallace sent a letter stating that Geico was "offering [its] underinsured motorist limits of $25,000" and that it "would be retaining [its] right of subrogation and pursuing the tortfeasor for recovery of that payment." (Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. 3.) On March 26, 2009, Smolen accepted the offer on behalf of Plaintiff and requested that the check be sent to Smolen's office. The same date, Wallace sent a letter (1) enclosing the $25,000 check;[3] (2) enclosing "a formal acknowledgment of [Geico's] substitution of limits;" (3) requesting that the form be signed and returned; and (4) stating that Geico would "be pursuing Liberty Mutual for our subrogation of this settlement." (Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. 6.) The form referenced in the letter is entitled "Oklahoma Acknowledgment/Receipt of Substituted Payment" and states that Plaintiff "acknowledge[s] receipt of [$25,000], which is the *substituted payment* from Liberty Mutual Insurance Company *for the limits of the liability insurance policy covering Chris*

---

[3] Geico's litigation position is that this $25,000 payment was "gratuitous," as Geico had placed a maximum value on Plaintiff's claim that was less than the tortfeasor's policy limits. (*See* Mot. for Summ. J. 12 (stating that "the payment of GEICO's policy limits to Plaintiff was purely gratuitous" because the tortfeasor "was not underinsured").)

3

*Ross* on the date of [the accident]." (*Id.* (emphasis added).) The form further states that Geico's payment was made "pursuant to 36 O.S. § 3636(E)[4] . . . and [was] intended to preserve any and all rights [Geico] may have at law or in equity against the tortfeasor, Chris Ross (Liberty Mutual)." (*Id.* (footnote added).) Smolen testified that, because Plaintiff had not reached any tentative settlement with Ross/Liberty and because Geico's "substitution" right was never triggered under Oklahoma law, Smolen assumed the substitution acknowledgment form was sent in error and disregarded it. Plaintiff never signed or returned this form. Smolen testified that the statement on this form confirmed what he had been verbally told by Geico and Liberty – that Ross' policy limit was $25,000.

On August 11, 2009, Geico initiated arbitration proceedings against Liberty after Liberty refused to subrogate Geico for the $25,000 payment to Plaintiff. On September 29, 2009, Plaintiff filed suit against Ross in state court ("first tortfeasor suit"). On November 2, 2009, the arbitrator issued a decision in favor of Geico; however, such decision was based on Liberty's failure to clearly outline its dispute to Geico's statement of damages. (*See* Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. 15 ("Damages were improperly disputed by Company 2, Liberty, pursuant to Rule 2-5 Contesting Damages . . . . Since this was not done by Company 2, damages are not considered in dispute.").) Thus, Geico was awarded $25,000 in subrogation from Liberty. Following arbitration, Liberty continued to seek a copy of any release obtained by Geico that would protect Liberty from suit by Plaintiff.

---

[4] The version of 36 O.S. § 3636(E) in effect at this time provided: "For purposes of this section, there is no coverage for any insured while occupying a motor vehicle owned by, or furnished or available for the regular use of the named insured, a resident spouse of the named insured, or a resident relative of the named insured, if such motor vehicle is not insured by a motor vehicle insurance policy." Presumably, Wallace meant to refer to § 3636(F), which explains "substitution" payments made by UM carriers.

On July 23, 2010, Plaintiff filed this action against Geico for bad faith and breach of contract. Plaintiff dismissed the first tortfeasor suit without prejudice on November 8, 2010. Less than one year later, on November 7, 2011, Plaintiff re-filed the state court action against Ross ("second tortfeasor suit"). The second tortfeasor suit remains pending in state court, although Ross has not been served with process in such case. To date, Plaintiff has not settled or otherwise resolved his claim against Ross and has not obtained any judgment against Ross.

On November 4, 2011, this Court entered an Opinion and Order denying Geico's motion to dismiss ("11/4/11 Order"). (*See* Doc. 80.) In denying Geico's motion to dismiss Plaintiff's bad faith claim, the Court explained the Oklahoma Supreme Court's decision in *Barnes v. Oklahoma Farm Bureau Mutual Insurance Company*, 11 P.3d 162, 169 (Okla. 2000) ("*Barnes II*") and reasoned:

> The Court concludes that Plaintiff's Second Amended Complaint sufficiently encompasses conduct that, if proven, may support a bad faith claim. The Court so concludes for two reasons. First, the Court rejects Defendant's principal argument that the phrase "in the event of payment" in § 3636(F) means that the subrogation right arises immediately upon payment to the insured, without regard to the factual circumstances presented. As explained above, such argument was not only rejected in *Barnes II* but was found to be an unreasonable construction of the statute, *see id.* at 173, and the Court finds no reason to expand upon the reasoning set forth in *Barnes II*. Defendant's cited cases from other jurisdictions are unpersuasive.
> 
> Second, Defendant is accused of doing what *Barnes II* prohibits – namely, reducing the total amount of insurance available to the insured where a reasonable evaluation of Plaintiff's claim would have revealed it to be in excess of both combined policies. In this case, Defendant allegedly accomplished the result of recovering some of the tortfeasor's liability proceeds *after* making its UM payment, rather than *conditioning* its UM payment on entitlement thereto. However, this difference in timing does not convince the Court that Defendant's alleged conduct falls outside the scope of *Barnes II*. *Barnes II* appears to reject a construction of Oklahoma's UM subrogation scheme that would allow a UM carrier to reduce an insured's total amount of proceeds from both policies, where the insured's damages are equal to or greater than the combined value of the policies. Depending on the factual circumstances, most of which are unknown at this stage of litigation, it may be deemed equally as egregious to condition a UM payment on a non-existent subrogation right than to pay UM limits and then pursue a non-existent subrogation right. Therefore, Plaintiff's allegations are sufficient to survive a motion to dismiss.

5

(Doc. 80 at 12-13 (footnote omitted).)[5] The Court also denied the motion to dismiss the breach of contract claim, reasoning that Geico's alleged conduct potentially violated state law applicable to the insurance contract. (*Id.* at 14-15.)[6]

Subsequently, Geico filed the pending motion for summary judgment, arguing that Geico acted reasonably in pursuing its subrogation interest as a matter of law and that an insurer cannot be forced to rely upon its insured to protect its subrogation recovery. Geico also argued that it was entitled to summary judgment on the breach of contract claim because Geico paid policy limits, and Plaintiff did not suffer any damages. Plaintiff did not specifically respond to Geico's breach of contract arguments, and all arguments and facts in support of summary judgment on that claim are deemed confessed.[7] The question remaining is whether Geico is entitled to summary judgment on Plaintiff's bad faith claim.[8]

---

[5] Prior to reaching this conclusion, the 11/4/11 Order sets forth a detailed explanation of Oklahoma's UM statutory scheme and the *Barnes II* decision. Such order is incorporated herein by reference.

[6] The Court permitted the contract claim to proceed despite Plaintiff's failure to attach the insurance policy or otherwise explain his theory of breach. The Court conducted independent research and determined that Plaintiff's allegations were sufficient to potentially state a claim for breach of statutory duties incorporated into the contract. (*See* 11/4/11 Order at 14.)

[7] Even after leniency and assistance from the Court at the dismissal stage, Plaintiff failed to cite any case law or make any specific arguments in response to Geico's motion for summary judgment on the contract claim. At the summary judgment stage, it was incumbent upon Plaintiff to specifically articulate the theory he would present to the jury on the contract claim and to demonstrate triable questions of fact regarding such theory. Plaintiff entirely failed to do so, and summary judgment is appropriate on the contract claim.

[8] The Tenth Circuit has indicated that a bad faith claim may proceed independently of a breach of contract claim, and the Oklahoma Supreme Court has not ruled otherwise. *See Vining on Behalf of Vining v. Enter. Fin. Grp., Inc.*, 148 F.3d 1206, 1214 (10th Cir. 1998) ("No court has held that an insured must actually prevail on a separate underlying breach of contract claim in order to maintain a successful bad faith claim, and we cannot predict that Oklahoma would impose such a condition precedent to a bad faith claim.").

**II.     Summary Judgment Standard**

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id*. However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party seeking to overcome a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

In the specific context of bad faith claims arising under Oklahoma law, the "mere allegation of an insurer's breach of the duties of good faith and fair dealing does not automatically entitle a litigant to submit the issue to a jury for determination." *City Nat'l Bank and Trust Co. v. Jackson Nat'l Life Ins.*, 804 P.2d 463, 468 (Okla. Civ. App. 1990). Instead, "[a] jury question arises only where the relevant facts are in dispute or where the undisputed facts permit differing inferences as to the reasonableness of the insurer's conduct." *Id.* (quoting *Duckett v. Allstate Ins. Co.*, 606 F. Supp. 728, 731 (W.D. Okla.1985)). Thus, the Court must "first determine, under the facts of the particular case and as a matter of law, whether insurer's conduct may be reasonably perceived as tortious." *Id.* In making such a determination at the summary judgment stage, the Court is cognizant that a jury "may be shown the entire course of conduct between the parties to arrive at a determination of whether [the bad faith] standard ha[s] been breached or not." *Timmons v. Royal Globe Ins. Co.,* 653 P.2d 907, 917 (Okla. 1982) ("The essence of the cause before the Court is

failure to deal fairly and in good faith with an insured and as such, the jury may be shown the entire course of conduct between the parties to arrive at a determination of whether that standard had been breached or not.").

## III.    Analysis

"Generally, an implied duty of an insurer to act in good faith and deal fairly with its insured is imposed by law upon the insurer-insured relationship, and a breach of that duty arises from a breach of the insurance contract where the breach occurs in a manner constituting a lack of good faith; *i.e.*, constituting bad faith." *Brown v. Patel*, 157 P.3d 117, 121 (Okla. 2007). However, because "a part of every contract in this state is the law applicable to that contract . . .[,] provisions of an insurance contract may arise from statute as opposed to the express writing contained in the document agreed to by the parties." *Id.* Thus, "a bad-faith action could be based upon an insurer's refusal to satisfy statutory obligations imposed upon or resulting from the insurance contract." *Id.* at 122. "The bad-faith action may also be based upon an insurer's failure to perform an act that is derivative or secondary in nature; that is, an insurer's duty that owes its existence to a preexisting implied contractual, or statutory, or status-based duty arising from the insurer-insured relationship." *Id.* In addition, bad faith actions may be based upon "an insurer's failure to follow judicial construction of insurance contracts or other applicable law." *Id.* (citing *Barnes II* as an example of this type of bad faith action). Thus, the Oklahoma Supreme Court has held that bad faith claims may be based upon: (1) failure to perform express contractual duties; (2) failure to perform statutory duties imposed upon the contract; (3) failure to perform certain acts that are "derivative" or "secondary" and that arise from the insurer-insured relationship; and/or (4) failure to follow Oklahoma case law interpreting insurance contracts or Oklahoma insurance statutes.

The essential elements of Plaintiff's bad faith claim are: (1) Plaintiff was covered under the Defendant's UM policy and Defendant was required to take reasonable actions in handling Plaintiff's claim; (2) the actions of Defendant were unreasonable under the circumstances; (3) Defendant failed to deal fairly and act in good faith toward Plaintiff in the handling of Plaintiff's claim; and (4) the breach or violation of the duty of good faith and fair dealing was the direct or proximate cause of any damages sustained by Plaintiff. *Badillo v. Mid Century, Ins. Co.*, 121 P.3d 1080, 1093 (Okla. 2005); *Walker v. Progressive Direct Ins. Co.*, 720 F. Supp. 2d 1269, 1273 (N.D. Okla. 2010). Plaintiff must ultimately prove each element by a preponderance of the evidence. *Timmons*, 653 P.2d at 913. For purposes of summary judgment, Geico challenges the last three elements.

### A. Unreasonable Actions and Failure to Act in Good Faith

In the 11/4/11 Order, the Court outlined Oklahoma's UM statutory scheme and explained relevant holdings in the *Barnes II* decision. Applying this law to the facts contained in the summary judgment record, the Court finds that the totality of Plaintiff's evidence is sufficient to create a question of fact as to the second and third elements – namely, whether Geico behaved unreasonably under the circumstances and whether Geico failed to deal fairly with Plaintiff. First, a reasonable jury could conclude that Wallace behaved unreasonably in assigning $25,000 as the maximum cost of future medical expenses in light of the surgical recommendation by Dr. Wilson and the reasonable value of spinal fusion surgeries.[9] If a reasonable evaluation would have led Geico to the conclusion

---

[9] Geico has moved to exclude an expert opinion by Dr. Kris Parchuri that such surgery would cost approximately $95,000. (*See* Doc. 61.) The Court need not reach this issue for purposes of summary judgment, as the Court finds that expert evidence is not required in order for a reasonable jury to conclude that $25,000 is an under-evaluation for such surgery, assuming that a jury concludes that a reasonable evaluation of Plaintiff's claim would have included the full value of the recommended surgery.

9

that Plaintiff's claim exceeded $125,000 (the amount of its and Liberty's combined policies), it in turn could have behaved unreasonably by pursuing subrogation from Liberty. It is not Geico's simple act of seeking subrogation that creates a jury question. It is Geico's act of seeking subrogation based on a potentially unreasonable evaluation, which, if performed reasonably, would have forced Geico to conclude that it had no right to reduce the total amount of insurance proceeds available to Plaintiff. (*See* 11/4/11 Order at 13 (concluding that *Barnes II* generally prohibits reducing the total amount of insurance available to the insured through subrogation, where a reasonable evaluation of an insured's claim would have revealed it to be in excess of both combined policies).) Now that the Court has record evidence regarding Plaintiff's medical claims and supporting documentation provided to Geico, the combined amount of the policies, and the entire course of conduct leading to Geico's decision to seek subrogation, the Court finds that a reasonable jury could conclude that Geico engaged in bad faith in seeking and retaining subrogation.

Second, a reasonable juror could conclude that Geico behaved unreasonably by reaching an "agreement" with Liberty that Geico would pay its UM limits but then be "reimbursed" this amount by Liberty. Geico's corporate representative admitted that such an agreement was unusual. This agreement may have been insufficient on its own to create a jury question as to bad faith. However, the agreement was followed by Geico incorrectly labeling its UM payment to Plaintiff as a "substitution" payment and enclosing a substitution acknowledgment form, despite the lack of any tentative offer of settlement from Liberty to Plaintiff. There could be no lawful "substitution" payment without such an offer. *See* Okla. Stat. tit. 36, § 3636(F)(2). Further, the substitution acknowledgment form states that Ross' policy limits were $25,000. It is a question of fact whether such statement was a deliberate attempt to mislead Plaintiff regarding the amount of Ross' liability coverage, but the claim notes indicate that Geico was aware that Ross' policy limit was actually

10

$100,000. In short, although Geico did pay its policy limits, there are circumstances surrounding Geico's payment that could support a finding of unreasonable conduct by Geico.

Geico argues that its decision to seek subrogation was not unreasonable because Plaintiff failed to actively pursue the tortfeasor, and it had to protect its subrogation rights or face expiration of the statute of limitations. While this argument may be persuasive in some cases, it is not persuasive viewing the facts of this case in a light most favorable to Plaintiff. The evidence supports a conclusion that Geico intended to seek subrogation immediately upon payment and without regard to Plaintiff's pursuit or non-pursuit of the tortfeasor. A reasonable jury could conclude that Geico and Liberty attempted to mislead Plaintiff into waiving his rights to $100,000 in proceeds from Liberty in exchange for $25,000 in proceeds from Geico, with the agreement that Liberty would "reimburse" Geico its $25,000. This would have been beneficial to both Geico and Liberty, if Liberty paid only the $25,000 in subrogation and Geico had no net loss after recovering subrogation. This did not actually occur because Plaintiff did not sign the waiver, and, ultimately, Liberty forced Geico into arbitration. Nonetheless, Geico has not presented undisputed evidence that its pursuit of subrogation was simply a last resort to avoid the running of the statute of limitations. Further, while Plaintiff's failure to actively pursue the tortfeasor potentially negates or mitigates any damages he allegedly suffered based on Geico's alleged bad faith reduction of the total insurance proceeds available to him, such failure is insufficient to demonstrate, as a matter of law, the undisputed reasonableness of Geico's conduct.

### B. Damages

Damages are problematic in this case because Plaintiff received policy limits from Geico and then failed to actively pursue or obtain any judgment against Ross. Plaintiff must demonstrate that Geico caused him actual damages by obtaining subrogation from Liberty and reducing the amount

11

of insurance proceeds available to him, although he never actively pursued these insurance proceeds. Plaintiff may have an uphill battle to demonstrate that he "remains in considerable and constant pain and has been unable to obtain a necessary surgery that would improve his quality of life," (Resp. to Def.'s Mot. for Summ. J. 23), when he never actively pursued other available insurance proceeds that could have paid for the surgery. Nonetheless, the Oklahoma Uniform Jury Instructions permit bad faith damages for financial loss, embarrassment and loss of reputation, and mental pain and suffering. *See* Okla. Unif. J. Instr. 22.4. A reasonable jury could conclude that Plaintiff suffered these types of damages as a result of Geico's alleged bad faith conduct in this case. Further, the second tortfeasor action was filed timely and does remain pending, and there is at least some possibility that the allegedly improperly reduced insurance proceeds are still at issue. Therefore, Plaintiff has presented sufficient evidence to reach a jury on the question of damages.

**VI.  Conclusion**

Defendant's Motion for Summary Judgment (Doc. 83) is GRANTED in part and DENIED in part. It is GRANTED as to the breach of contract claim and DENIED as to the bad faith claim. The parties are ordered to submit a revised Pretrial Order in accordance with this Opinion and Order no later than Tuesday, February 14, 2012.

SO ORDERED this 13th day of February, 2012.

_____
TERENCE C. KERN
United States District Judge